# EXPERT REPORT OF DAN PACHOLKE

DEON "STRAWBERRY" HAMPTON VS. IDOC
December 6, 2017

INTRODUCTION:

I have been retained as an expert in penology by Vanessa del Valle, Clinical Assistant Professor of Law, Roderick and Solange, MacArthur Justice Center, Northwestern School of Law. I was asked to review various documents and determine whether or not the Illinois Department of Corrections complied with generally accepted practices, principles and standards with regard to the management and placement of Deon "Strawberry" Hampton, a transgender woman.

METHODOLOGY

1. Reviewed various documents relevant to Deon "Strawberry" Hampton's placement and management within the Illinois Department of Corrections, including the Declaration of Dr. George Brown.
2. Conducted a review of materials related to the management of transgender women in a correctional setting.

In preparing this report I have also relied upon my more than thirty-five (35) years of experience and related training and education in the field of adult institutional corrections. This experience includes: Correctional Officer (2.5 years); Lieutenant (3 years); Captain (6 years); Superintendent (5 years); Director of Performance Management (4 years); eight years in administration (Deputy Director Prisons, Director Prisons, Deputy Secretary, and Secretary) in the Washington State Department of Corrections (WADOC); and work performed in over 20 states and four jurisdictions outside of the continental United States. I have also been a consultant with the National Institute of

Corrections, New York University and have published a number of articles related to the field. I co-authored a book and field guide on prison safety, Keeping Prisons Safe, and co-designed the WADOC CORE training program and the Correctional Officer Achievement Program. (See Attachment 1: CV)

BACKGROUND:

Deon "Strawberry" Hampton is a 26-year-old transgender woman who has been housed at Menard Correctional Center, a maximum-security adult male correctional facility since August 23, 2017. She has identified as a female since she was 5 years old and has lived as a woman while incarcerated. In 2012, she was diagnosed with gender dysphoria by an Illinois Department of Corrections (IDOC) Psychiatrist and has been on cross-sex hormone treatment in IDOC since July 2016. The IDOC has labeled her as "seriously mentally ill" and she takes medication for her illnesses.

Records indicate that while Ms. Hampton was housed at Pinckneyville Correctional Center, she was sexually assaulted by Correctional Officers on multiple occasions. After she reported this abuse, Officers imposed a number of disciplinary citations on her that resulted in her placement in segregation and transfer to Menard Correctional Center.

PLACEMENT DECISION:

In reviewing the placement decisions of the IDOC related to the placement and housing of a transgender woman, the Prison Rape Elimination Act sets forth the

relevant standards. The relevant portions of the standards include:

Standard 115.42(c)—Placement should ensure the inmates health and safety whether the placement would present management or security problems. This evaluation must be done on a case by case basis.

Standard 115.42(d)—Placement assignment for each transgender inmate shall be reassessed at least twice each year to review any safety threats.

Standard 115.42(e)—Serious consideration should be given to a transgender inmate's own views with respect to her safety.

Standard 115.41—Screenings to determine appropriate placement should consider the following factors:

    (1) Whether the inmate has a mental, physical or developmental disability;

    (2) The age of the inmate;

    (3) The physical build of the inmate;

    (4) Whether the inmate has previously been incarcerated;

    (5) Whether the inmate's criminal history is exclusively non-violent;

    (6) Whether the inmate has prior criminal convictions for sex offenses against an adult or child:

    (7) Whether the inmate is or is perceive to be gay, lesbian, bisexual, transgender, intersex, or gender non-conforming;

    (8) Whether the inmate has previously experienced sexual victimization;

    (9) The inmate's own perception of vulnerability; and

    (10) Whether the inmate is detained solely for civil immigration purposes.

First, Ms. Hampton is an average sized transgender woman who has long identified as female. She has a documented history of sexual abuse and has been previously incarcerated. When she was 17 and in juvenile prison, an officer sexually assaulted her and was convicted for the act. She has prior convictions of burglary and home invasions. For purposes of placement and classification, her criminal record should be characterized as exclusively non-violent. She has been labeled by the IDOC as seriously mentally ill. She has a gender dysphoria diagnosis from an IDOC Psychiatrist and has been under IDOC cross-sex hormone therapy treatment since July 2016. As a result, her level of estrogen is the same as a biological female. She reports that she has never had any sexual interest in women. She also reports multiple instances of sexual victimization in IDOC's men's prisons and that she is currently scared for her life.

Based on an analysis of these factors Ms. Hampton's continued placement in a men's prison, and specifically her placement at Menard Correctional Center, violates all professionally accepted practices. There is no security or penological justification for housing her in a men's prison. Ms. Hampton's placement in Menard is unnecessary for security purposes and increases her risk of victimization and suicide.

According to IDOC's 2016 PREA reports, there are 28 transgender women housed throughout its 24 male correctional facilities and none housed in its female facilities. This leads me to believe that not only has IDOC failed to make a

good faith effort to appropriately classify Ms. Hampton, but that it has failed to meaningfully implement the PREA Standard regarding the classification of transgender people in their system in general.

Placing Ms. Hampton at a women's prison is appropriate and would reduce many of the negative factors of her current placement. It would reduce the risk of her being further victimized, making her physically safer. She would be in an environment where she is less likely to be ridiculed and in which she would be subject to policies and practices that comport with her gender. This would improve her mental health, reducing her risk of suicide. Transgender people have the highest suicide rate in the nation. There is nothing that I have reviewed that would indicate that she would be a security threat at a women's correctional facility.

GRIEVANCES AND RETALIATION:

Professionally accepted practices make clear that prisoners must have access to grievances and must be able to access grievances without retaliation. The PREA standards state that "the agency shall provide multiple internal ways for inmates to privately report sexual abuse and sexual harassment, retaliation by other inmate's or staff for reporting sexual abuse and sexual harassment, and staff neglect or violation of responsibilities that may have contributed to such incidents. Staff shall accept reports made verbally, in writing, anonymously, and from third parties and shall promptly document any verbal reports." (Standard

115.51). Additionally in the American Correctional Association, Standards for Adult Correctional Institutions 4th Edition, standard 4-4284 on page 77 it states: "A grievance procedure is an administrative means for the expression and resolution of inmate problems. The institution's grievance mechanism shall include provisions for the following: written responses to all grievances, including the reasons for the decision; response within a prescribed, reasonable time limit, with special provisions for responding to emergencies; supervisory review of grievances; participation by staff and inmates in the procedure's design and operation; access by all inmates, with guarantees against reprisals; applicability over a broad range of issues; and means for resolving questions of jurisdiction."

Prisons are by nature coercive. Correctional Officers control almost every aspect of the lives of incarcerated people, so opportunities for retaliation are everywhere and is not uncommon. Retaliatory behavior occurs in facilities throughout the country and is well-documented in litigation and media reports. It can take many forms, including through the disciplinary system. The standard of evidence required for a finding of guilt from an alleged rule violation is low, generally an officer's word is all it takes. Disciplinary hearings and appeals processes for alleged misconduct are overly reliant on officer testimony and lack the sophistication necessary to identify officer abuse.

In Ms. Hampton's case, she complained and filed grievances about abuse she suffered, to include sexual abuse, from correctional officers at Pinckneyville

Correctional Center. After reporting these allegations, she received several subsequent misconduct reports in addition to being subject to other retaliatory actions to include lack of access to showers and phones, leading to a spiraling of disciplinary sanctions. This led to her current placement at Menard, a maximum-security facility, with a disciplinary segregation sanction through April of 2018, where she reports the retaliation continues through the withholding of food and other inhumane conditions. There is no indication that IDOC engaged a multi-disciplinary review team to identify other alternatives to punitive segregation. No attempts were made to address Ms. Hampton's alleged behavior through a programmatic or therapeutic response, or with a trauma-informed approach. At no point was her classification reviewed to assess the appropriateness of her placement or the safety and behavioral impacts of keeping her in a men's facility. On the contrary, in at least one disciplinary response, the warden authorized a sanction that overrode a recommendation from IDOC mental health staff. There is no penological justification for imposing segregation on Ms. Hampton—especially given her vulnerabilities and her mental health needs. Throughout my decades working in prisons, I have encountered this fact pattern on more than one occasion. A prisoner files a complaint against an officer, the officer responds by imposing formal or informal disciplinary sanctions against the prisoner and the prisoner suffers serious consequences because of the structure of the prison's disciplinary process. For this reason, and because I cannot identify a legitimate penological justification for the punishment imposed on Ms. Hampton, it is my opinion that the disciplinary sanctions are invalid.

CONCLUSION:

By placing Ms. Hampton in male correctional facilities, IDOC has failed to protect her from abuse and other factors leading to the degradation of her mental and physical health. The federal Prison Rape Elimination Act (PREA) standard requires that facility and housing assignments be made through an individualized assessment rather than solely on external genitalia. This assessment must give 'serious consideration' to the individual's own views regarding their safety and their gender identity.

_____    12/6/17
Dan Pacholke                Date

# DAN PACHOLKE

303 Kenyon Street NW 2-F □ Olympia, WA  98502   □  (360) 701-9508   □  e-mail:  d.pacholke@yahoo.com

**PROFILE**

Served the Washington State Department of Corrections for 33 years, starting as a Correctional Officer and retiring as Secretary. Leader in segregation reform and violence reduction in prisons. Extensive experience in program development and implementation, facility management, and marshaling and allocating resources. Proven ability to make change.  Led efforts resulting in a 30% reduction in violence and a 52% reduction in use of segregation in Washington State Prisons. Co-founder of Sustainability in Prisons Project. Champion of humanity, hope and legitimacy in corrections.

**EMPLOYMENT HISTORY**

**New York University, Litmus at Marron Institute of Urban Management**
**Associate Director** 2016-present
> Collaborate with researchers and practitioners to develop alternatives to segregation and transform corrections management. Advance stakeholder-led research and innovation by soliciting, supporting, and disseminating the best new strategies to create safer, more rehabilitative corrections environments.

**Washington State Department of Corrections**
**Secretary** 2015-2016
> Governor appointee providing executive oversight of the agency with a yearly operating budget of 850 million and 8,200 full time employees. Reorganized agency to allow for greater emphasis on effective reentry. Led department through response and recovery from a crisis resulting from the discovery of a sentencing calculation error that had occurred for over 13 years.

**Deputy Secretary** 2014-2015
> Oversight over operations divisions: Offender Change; Correctional Industries; Community Corrections (16 Work Releases and 150 field offices); Prisons (15 facilities); and Health Services.  These combined operations had a yearly operating budget of 700 million and 7,166 full time employees.  Emphasis on core correctional operations, violence reduction, and performance management leadership to affect positive and sustainable system wide change.

**Director, Prisons Division** 2011-2014
> Oversight over 15 institutions and contract relationships with jails and out of state institutions incarcerating approximately 18,000 offenders.  Also responsible for providing emergency response and readiness oversight to all facilities and field offices of all divisions. Advanced multi-faceted violence reduction strategy to include the development and implementation of the "Operation Ceasefire" group violence reduction strategy for application in close custody units in prisons. Expanded Sustainability in Prisons Project programs to all prison facilities. Implemented classroom-setting congregant programming in intensive management units.

**Deputy Director, Prisons Division** 2008-2011
> Administrator over 6 major facility prisons, multi-custody level for adult male offenders with a biennial budget of 290 million. Provided leadership and appointing authority decision making to six facility Superintendents. Through Great Recession implemented staffing reductions, offender movement alterations and cost savings initiatives while maintaining safety and security. Represented the Department in legal issues, labor relations, media, staff discipline hearings, union relations and bargaining. Oversaw statewide operations of Emergency Preparedness and Response, Intelligence & Investigations, Intensive Management Units, Offender Grievance Program, Offender Disciplinary Program, Food Service, Sustainability and Close Custody Operations. Implemented statewide system of security advisory councils and security forums to improve staff safety.

**Monroe Correctional Complex**
**Interim Superintendent** 2008

Led a 2,486-bed, multi-custody facility for adult male offenders.

**Stafford Creek Corrections Center**
**Superintendent** 2007-2008

Led a 2,000-bed, multi-custody facility for adult male offenders with a biennial budget of 39 million. Implemented Sustainability in Prisons Project initiatives to include large scale composting to include zero-waste garbage sorting. Initiated first dog training programs for male offenders.

**Cedar Creek Corrections Center**
**Superintendent** 2003-2007

Led a 400-bed, minimum-security adult male correctional facility, with a biennial budget of 7.3 million. Directed operational and related program activities to include security and custody programs, medical services, plant maintenance, education, and food service. Co-founded the Sustainability in Prisons Project with Nalini Nadkarni, PhD.

**Monroe Correctional Complex**
**Special Assignment Deputy Superintendent** 2002

Formulated new strategic direction in order to enhance operations and security at the Complex, which consists of four separate units and houses approximately 2,300 adult male felons. Managed unit operations and security. Supervised the Intelligence Investigative Unit and Offender Grievance System. Developed and implemented capital construction initiatives at the Special Offender Unit and the Washington Reformatory Unit to enhance security of these Units.

**Headquarters**
**Performance System Administrator** 1999-2002

Led the development and implementation shift from staff training department to an organizational performance system. Administered staff performance academies, supervised five regional teams, four Program Managers and provided leadership for policy development to support this department wide program. Administered the Department's Emergency Response Plan, Emergency Operations, Officer Safety Program and Firearms Training Unit.

**Headquarters**
**Emergency Response Manager** 1995-1999

Developed and implemented statewide emergency response system. Directed the development of departmental policy, emergency response team academies and response protocols. Managed emergencies and security events. Directed Critical Incident Review Teams in the post incident analysis of critical incidents department wide. Led development of security plans for the management of high-risk operations to include 400 offenders out of state, Y2K, and execution security.

**Clallam Bay Corrections Center**
**Correctional Captain** 1989-1995

Responsible for the security management of a maximum, close, and medium custody male facility. Oversaw facility mission changes including: close custody conversion; implementation of blind feeding; facility double bunking; opening of an intensive management unit; opening of first direct supervision unit; and developed the facility's Emergency Response Plan.

**Clallam Bay Corrections Center**
**Correctional Lieutenant** 1986 -1989

**Washington Corrections Center**
**Correctional Sergeant** 1985-1986

**McNeil Island Corrections Center**
**Correctional Officer** 1982-1985

**PUBLICATIONS**

Useem, Bert, Dan Pacholke, and Sandy Felkey Mullins. "Case Study–The Making of an Institutional Crisis: The Mass Release of Inmates by a Correctional Agency." *Journal of Contingencies and Crisis Management* (2016)

Pacholke, Dan (2016, July 27). Change is relative to where you begin. Vera Institute of Justice. Think Justice Blog. https://www.vera.org/blog/addressing-the-overuse-of-segregation-in-u-s-prisons-and-jails/change-is-relative-to-where-you-begin

Pacholke, Dan and Sandy Felkey Mullins. *More Than Emptying Beds: A Systems Approach to Segregation Reform*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance, 2016. NCJ 249858.

Pacholke, D. (2014, March). Dan Pacholke: How prisons can help inmates lead meaningful lives
[Video file]. Retrieved from
https://www.ted.com/talks/dan_pacholke_how_prisons_can_help_inmates_live_meaningful_lives?language=en

Young, C., Dan Pacholke, Devon Schrum, and Philip Young. *Keeping Prisons Safe: Transforming the Corrections Workplace*. 2014.

Aubrey, D., LeRoy, C. J., Nadkarni, N., Pacholke, D. J., & Bush, K. Rearing endangered butterflies in prison: Incarcerated women as collaborating conservation partners. 2012.

**AWARDS**

Olympia Rotary Club, Environmental Protection Award, 2013
Governor's Distinguished Managers Award, 2012
Secretary of State, Extra Mile Award, 2007
Governor's Sustaining Leadership Award, 2003

**CONSULTING**

Sustainability in Prisons Project, Co-Director
2004-2015

Nebraska Department of Correctional Services
2015
> With Bert Useem, PhD, provided system assessment following May 2015 disturbance at Tecumseh State Correctional Institution in which two inmates were killed. Identified underlying causal factors and provided recommendations.

National Institute of Corrections
1998 to 2002
> Provided training and consultation services to state, territory and federal correctional systems. Responsible for delivering of training to include: Management of Security, Entry Level Supervision, Emergency Preparedness Assessment, Disturbance Management and Basic Security.

Defensive Technology Corporation
Senior Instructor
1995 to 1998
> Provided tactical and specialty munitions training to correctional and law enforcement personnel throughout the U.S.

Security Auditing & Critical Incident Reviews
Lead Auditor
> Completed security audits and critical incident fact finding reviews in facilities throughout the Washington State Department of Corrections and two correctional jurisdictions in other states, one of which involved multi-jurisdictional entities.

Attachment 1
**EDUCATION:**
      The Evergreen State College, BA, Olympia, Washington