**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

DEON HAMPTON (M15934),                  )
                                        )
       Plaintiff,                        )
                                        )
       v.                                )      Case No. 3:17-CV-936-DRH
                                        )
ILLINOIS DEPARTMENT OF                  )
CORRECTIONS DIRECTOR JOHN               )      The Hon. David R. Herndon
BALDWIN, WARDEN JACQUELINE              )
LASHBROOK, OFFICER MOLLY,               )
SERGEANT T. JONES, OFFICER JOHN         )
MCCALEB, OFFICER GRIFFIN,               )
LIEUTENANT HELD, INTERNAL AFFAIRS       )
OFFICER BRIDGES, OFFICER CHITTY,        )
OFFICER DUDZINSKI, OFFICER              )      JURY TRIAL DEMANDED
COCKRUM, OFFICER DOMSTORFF,             )
OFFICER MILES, OFFICER GRAVES,          )
OFFICER CARON, OFFICER POWELL,          )
OFFICER KENT BROOKMAN, INTERNAL         )
AFFAIRS OFFICER HUEY, and               )
JOHN DOES 1-11,                         )
                                        )
       Defendants.                       )

## SECOND AMENDED COMPLAINT

Plaintiff Deon "Strawberry" Hampton, by her undersigned attorneys, for her complaint

against Defendants Illinois Department of Corrections Director John Baldwin, Warden

Jacqueline Lashbrook, Officer Molly, Sergeant T. Jones, Officer John McCaleb, Officer Griffin,

Lieutenant Held, Internal Affairs Officer Bridges, Officer Chitty, Officer Dudzinski, Officer

Cockrum, Officer Domstorff, Officer Miles, Officer Graves, Officer Caron, Officer Powell,

Officer Kent Brookman, Internal Affairs Officer Huey, and John Does 1-11, alleges as follows:

## INTRODUCTION

1.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the First, Eighth, and Fourteenth Amendments to the United States Constitution, Title IX, the Religious Land Use and Institutionalized Persons Act, and the Illinois Hate Crimes Act.

2.     Plaintiff is a 26-year-old transgender woman who has been housed at Menard Correctional Center ("Menard"), a high security men's prison, since August 23, 2017.  She began living as a girl when she was five years old and has continued to live as a young woman throughout her incarceration.  Prior to her placement in Menard, Plaintiff was housed at Pinckneyville Correctional Center ("Pinckneyville") where several correctional officers sexually assaulted her on multiple occasions.  When she reported this abuse, the officers retaliated by beating her and threatening to "bury her in segregation."  The officers followed through on this threat by filing false disciplinary charges against her that resulted in a sentence of segregation until approximately May 2018.  She was also transferred to Menard as a result of these false charges.

3.     Officers at Menard have targeted Plaintiff both in retaliation for her complaints, and because of her gender, by subjecting her to constant sexual harassment, including the use of derogatory names, as well as other verbal abuse.  Officers have also beat her, and made clear that they will not protect her from attacks by other prisoners.  On at least one occasion, officers stood by and allowed another prisoner to beat Plaintiff in a holding cell in the infirmary.  On at least four occasions, officers themselves beat Plaintiff, each time inflicting serious injury.

4.     While physically attacking Plaintiff, threatening, and harassing her, correctional officers at Menard have told her that the abuse is retaliation for the complaint she filed at

Pinckneyville regarding the officers there who sexually assaulted her.  Menard officers have further asserted that if she reports the abuse she is experiencing at Menard, the retaliation will continue.

5.      The officers at Menard, like those at Pinckneyville, have attempted to cover up their actions by giving Plaintiff false disciplinary tickets, which keep adding to her segregation time, and threatening her with future beatings if she complains about her treatment.

6.      Plaintiff's physical and emotional well-being are in jeopardy at Menard.  As a transgender woman with mental health needs, Plaintiff is particularly vulnerable in a high security men's prison.  Her vulnerability is exacerbated by the fact that the officers at Menard are purposefully failing in their duty to protect her from harm and in fact are often initiating the abuse because of their hatred and animus towards transgender women.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

8.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

9.      Plaintiff is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  She is currently confined at Menard Correctional Center in Chester, Illinois.

10.      Defendant John Baldwin is the Director of the Illinois Department of Corrections ("IDOC").  As such, he was acting under color of law.  At all relevant times to the events at issue in this case, Defendant Baldwin maintained administrative and supervisory authority over the operations of the all prisons in Illinois, including Menard Correctional Center.  At all relevant

times, Defendant Baldwin promulgated rules, regulations, policies, and procedures of the IDOC. Defendant Baldwin is sued in his official capacity.

11.     Defendant Jacqueline Lashbrook is the Warden of Menard Correctional Center. At all times relevant to the events at issue in this case, Defendant Lashbrook was employed by the Illinois Department of Corrections.  As such, she was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Lashbrook promulgated rules, regulations, policies, and procedures at Menard.  Defendant Lashbrook is responsible for supervising all staff and managing all operations at Menard.  She is sued in her individual and official capacities.

12.     Defendants Officer Molly, Sergeant T. Jones, Officer John McCaleb, Officer Griffin, Lieutenant Held, Internal Affairs Officer Bridges, Officer Chitty, Officer Dudzinski, Officer Cockrum, Officer Domstorff, Officer Miles, Officer Graves, Officer Caron, Officer Powell, Internal Affairs Officer Huey, and John Does 1-11 are officers at Menard Correctional Center.  At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the Illinois Department of Corrections.  These defendants are sued in their individual capacities.

## FACTUAL ALLEGATIONS

### Plaintiff is a Transgender Woman

13.     Since the young age of five, Plaintiff has identified as a female.  Her family and her community also began treating her as a female at a young age.

14.     In 2012, Plaintiff was diagnosed with gender dysphoria by an IDOC psychiatrist.

15.     Throughout the years, Plaintiff took hormones intermittently to transition her body from male to female.  Plaintiff consistently began cross-sex hormone treatment in IDOC custody in July 2016 while housed at Lawrence Correctional Center.

16.     From December 2016 to July 2017, Plaintiff's lab levels showed that her testosterone levels were dropping and her estrogen levels were increasing.  By March 2017, Plaintiff was no longer in the male range for testosterone levels and she was in the female range for estrogen levels.

17.     Plaintiff's most recent lab results from July 2017 show that her testosterone levels are currently at 6/ng/dL.  The normal reference range for testosterone levels in males is 300-1080 ng/dL.  This means that Plaintiff can no longer obtain an erection and is therefore impotent.

18.     Plaintiff is and has always been sexually attracted exclusively to men.

19.     Plaintiff first entered IDOC custody on her current sentence in April 2015. Despite being a transgender woman, Plaintiff was placed in a men's prison, Hill Correctional Center, without receiving a formal, in-person review to determine whether she could be appropriately placed in a women's prison.

20.     Since entering IDOC custody, Plaintiff has exclusively been housed in male prisons and has experienced endless harassment and abuse by IDOC staff and prisoners because of her transgender status and because she has been inappropriately housed in a men's prison.

**Pattern and Practice Allegations**

21.     According to the 2016 Prison Rape Elimination Act ("PREA") reports of IDOC facilities, there were no transgender prisoners in the two female prisons (Logan Correctional Center and Decatur Correctional Center), and 28 transgender women housed throughout the 24 male prisons.  According to the report, three transgender women were housed in Menard.  4.4% of the total number of people interviewed by the PREA auditors were transgender.

22.     Upon information and belief, there is currently one transgender prisoner in Logan, however, as the PREA reports demonstrate, this is an anomaly—almost all the transgender

inmates are housed in male prisons where they are at risk of being subjected to sexual and physical abuse.

23.     According to the National PREA Resource Center, "Being transgender is a known risk factor for being sexually victimized in confinement settings.  The [PREA] standard, therefore, requires that facility, housing, and programming assignments be made 'on a case-by-case basis.'  Any written policy or actual practice that assigns transgender or intersex inmates to gender-specific facilities, housing units, or programs based solely on their external genital anatomy violates the standard.  A PREA-compliant policy must require an individualized assessment.  A policy must give 'serious consideration' to transgender or intersex inmates' own views with respect to safety.  The assessment, therefore, must consider the transgender or intersex inmate's gender identity – that is, if the inmate self-identifies as either male or female.  A policy may also consider an inmate's security threat level, criminal and disciplinary history, current gender expression, medical and mental health information, vulnerability to sexual victimization, and likelihood of perpetrating abuse.  The policy will likely consider facility-specific factors as well, including inmate populations, staffing patterns, and physical layouts.  The policy must allow for housing by gender identity when appropriate."  National PREA Resource Center (available at https://www.prearesourcecenter.org/node/3927).

24.     According to a 2014 report issued by U.S. Department of Justice's Bureau of Justice Statics, almost 40% of transgender prisoners reported sexual victimization in state and federal prisons—a rate that is ten times higher than for prisoners in general.  U.S. Dep't of Justice, Bureau of Justice Statics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12*, *Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates*, December 2014 (available at https//www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf).

25.     "Transgender inmates who are assaulted or harassed are often placed in solitary confinement, which, though intended for their protection, is in fact a severe punishment. Isolation takes an enormous psychological toll on inmates, and can put them at increased risk of assault by guards.  It deprives them of access to group therapy and educational programs that could improve employment prospects upon release."  *Prisons and Jails Put Transgender Inmates at Risk*, The Editorial Board, The New York Times, Nov. 9, 2015 (available at https://www.nytimes.com/2015/11/09/opinion/prisons-and-jails-put-transgender-inmates-at-risk.html).

### Plaintiff was Sexually and Physically Abused at Pinckneyville[1]

26.     In the fall of 2016, Plaintiff was transferred to Pinckneyville.  At Pinckneyville, correctional officers and other staff discriminated against her and subjected her to a hostile environment.  Some officers rejected her identity as a transgender woman and others would make sexual comments to her.  Officers would call her derogatory slurs for gay people, say things like she "sucks good dick" and "your ass is fat, you must be getting a good dicking," and call her names such as "creamberry," in reference to anal sex.  Plaintiff consistently asked them to stop, but her requests were met with laughter.

27.     While at Pinckneyville, Plaintiff came to be housed with Denashio Tester, who also identified as a transgender woman.  For months, officers verbally harassed Plaintiff and Tester about their gender identity and sexual orientation when they walked by their cell.

28.     On March 4, 2017, at around 9:30 pm, Lieutenant Myers, Officer Spiller, Sergeant Scro, Major Adams, Officer Williams, Officer Petaskaya, Officer Dudek, Officer

---

[1]  The events that occurred at Pinckneyville are the subject of a separate case, *see Hampton v. Meyer et al.*, 17 cv 860 (S.D. Ill), and are recounted here only to explain the retaliation Plaintiff is experiencing at Menard.

Porter, Officer Hensley, and Internal Affairs Officer Bennett, entered Plaintiff's and Tester's cell. These officers made Plaintiff put on a thong and her bra and they made Tester put on his boxers. The officers then took Plaintiff and Tester out of their cell to an office and forced Plaintiff and Tester to dance sexually while they laughed. They made Plaintiff reveal her breasts and anus, and they forced Plaintiff and Tester to touch themselves and each other. The officers grabbed Plaintiff's breasts and butt. They called Plaintiff and Tester derogatory names like "dick sucker," "cock sucking," "man eater," "sissy," "fag," "faggot," and more.

29.     Lieutenant Myers then got on the phone and called Lieutenant (now Major) Lawless. He gave Plaintiff the phone and forced her to sing Happy Birthday to Lieutenant Lawless and to say sexual comments to him like "I want you to fuck me," "you want me bouncing on your dick while I cream all over it," and "you want me sucking on your dick."

30.     After the phone line went dead, the officers gave Plaintiff and Tester soda and chips and threatened that if they told anyone about what happened, the officers would "beat their asses and make their bodies disappear."

31.     Throughout the next three months, these officers pulled Plaintiff and Tester out of their cell approximately four more times and forced them perform sexual acts for the officers' entertainment. Out of fear, Plaintiff stayed quiet and did not tell anyone what the officers were doing to her and Tester.

32.     On May 24, 2017, around 5:00 pm, Officer Kennedy came to Plaintiff's and Tester's cell and asked, "What y'all doing, fucking or something?" Plaintiff and Tester, tired of all the sexual abuse and harassment, responded that they would file a complaint if he continued to talk to them in that manner. Sergeant Homoya then came by their cell and said, "I wish I could catch y'all fucking," and that he "bets Tester be fucking the shit out of you." He also

asked them if they have "ever had a big dick in their mouth?"  He also said he could picture Plaintiff sucking his dick on a boat.  Then he asked if he could pay them to suck his dick and to see them have sex.  He also grabbed his genitals and motioned.  Plaintiff and Tester told him that they would file a complaint through the prison's Prison Rape Elimination Act ("PREA") process if he continued to harass them, and Sergeant Homoya responded: "If you bitches want to call PREA, I'm going to lock you whores up."

33.     Later that night at around 9:30 pm, Sergeant Homoya, Officer Kennedy, Lieutenant Myers, Officer Spiller, Sergeant Scro, Major Adams, Officer Williams, Officer Petaskaya, Officer Dudek, Officer Porter, Officer Hensley, Internal Affairs Officer Bennett, Lieutenant James, Officer Kays, Officer Mercks, Major Lively, and Officer Jones, went to Plaintiff's and Tester's cell.  Plaintiff stated loud enough for others to hear: "I did nothing wrong, I want to talk to I.A. and the Warden."  The officers removed Tester from the cell in nothing but his shower shoes and briefs.

34.     Major Adams then cuffed Plaintiff behind her back and walked her into the shower.  The commotion woke sleeping prisoners in the wing, and drew others to their cell doors.  Major Adams kicked Plaintiff in the upper chest and pushed her head to the wall.  Other officers then began slamming, punching, stomping, kicking, and kneeing Plaintiff.  One officer stuck a finger in her anus.  Plaintiff cried out for help and yelled, "I didn't do anything, why are y'all beating me?"  Plaintiff begged the officers to stop hurting her and the officers responded, "Shut up you stupid fag, this is what happens when you call PREA on us."

35.     The officers then grabbed Plaintiff by her neck, hair, and arms and dragged her out of the shower and off the wing to a segregation cell.  In that cell, the officers pinned her down to the bed with their knees in her back.  Plaintiff stated to the officers, "Why y'all doing

this?  I can't breathe."  Internal Affairs Officer Bennett said that he did not like fags, and that

there were no women there, only men.

36.     The officers then began forcefully removing her clothes by pulling her pants

down to her ankles.  They attempted to remove her shirt but it would not come off.  Officer

Porter then left and returned with what appeared to be a black and silver pocket knife.  They then

cut her shirt and IDOC-issued bra off, as well as her pants.  Plaintiff feared for her life and

pleaded with the officers not to kill her.  The officers stood around laughing at her while she was

face down and naked on the bed.

37.     The officers then forcefully removed the cuffs, cutting her wrists.  They picked up

the ripped clothing and left her in the cold cell without a jumpsuit for several hours.  Plaintiff

cried for hours after the incident and screamed that she needed to speak with PREA and a crisis

team, but she received no assistance.

38.     Sergeant Homoya prevented Plaintiff from receiving any medical care.  He stayed

and did overtime that night, and told Nurse Kim Richardson that Plaintiff was fine so that

Plaintiff would not be seen by the medical staff.

39.     The next day on May 25, Plaintiff filed a formal PREA complaint with mental

health staff Ms. Mason—Plaintiff detailed the physical assault she suffered the night before as

well as the sexual abuse she experienced for months.

40.     Internal Affairs Officer Frank then came to speak with Plaintiff.  At first Plaintiff

thought he was investigating her PREA claim, but he ended up focusing solely on Plaintiff's

relationship with Tester.  Plaintiff attempted to turn the conversation towards her assault the

previous night.  She told him that she had injuries on her wrists and bruises on her chest, but he

failed to take any pictures of her injuries.  She also told Internal Affairs Officer Frank about all

the sexual abuse she experienced, including the phone sex incident from March.  He offered to make a deal with her and allow her and Tester to be placed together if she dropped her PREA report.  Plaintiff refused to drop her report, and he said she would be given "bogus tickets" and "buried in seg," and would not be fed or given a shower.

41.     From May 24 until August 23 (when she was transferred out of Pinckneyville), Plaintiff remained in segregation for all but approximately three days due to various alleged disciplinary infractions—she was given numerous disciplinary tickets by the officers who continued to sexually harass and physically abuse her which kept increasing her segregation time.

42.     While in segregation, Plaintiff was denied her transgender support group.  She was denied phone privileges.  She was also frequently denied a shower and food under the pretense that she was on a hunger strike.  Plaintiff lost over 35 pounds as a result.  Officers Spiller and Thompson laughed at Plaintiff when she asked for food and a shower, calling her derogatory names and threatening bodily harm.  Officer Spiller additionally stated he would "break her fucking neck" for reporting what he did on March 4.

43.     The officers never provided Plaintiff with a new IDOC-issued bra, which she was approved for, after they cut it off during the May 24, 2017 attack.

44.     On June 16, 2017, Plaintiff again reported on Officer Spiller and the other officers to Internal Affairs and Mental Health.  Three days later, she was given a ticket for allegedly making threats for which she was sentenced to an additional three months in segregation.

45.     On June 29, 2017, Plaintiff attempted to speak with a crisis team member and mental health.  Officer McKinstry told Plaintiff that she "can't have shit," and "to lay his faggot ass down."  When Plaintiff said she was hungry and asked for her lunch tray, Officer McKinstry

said, "Starve bitch."

46.     All the harassment, abuse, and trauma Plaintiff was experiencing at Pinckneyville

caused her extreme stress and anxiety.  Around June 2017, the mental health staff at

Pinckneyville prescribed Plaintiff lithium to help control her depressive symptoms.   The mental

health staff also labeled Plaintiff Serious Mentally Ill ("SMI").

47.     On July 1, 2017, Officer Bennett gave Plaintiff a ticket for allowing another

prisoner to use her Securus pin number to contact her mother.  In her hearing, Plaintiff stated,

"He used my pin number to contact an outside source, due to me being sexually and physically

assaulted by an IDOC correctional officer, so I have to do whatever I could to get help."

Plaintiff was given an additional month of C Grade, to be served consecutive to the prior ticket.

48.     On July 4, 2017, Warden Love was doing rounds when he stopped and asked a

lieutenant and Officer Morton, "Is that fag right there?"  Plaintiff was in her cell and said, "Can I

talk to you – why would you say what you just said about me?"  The Warden responded, "I ain't

comin to that damn cell, so if you wanna talk, talk to me from right here."  The Warden was

heard talking about how he does not condone gay peoples' lifestyle, and using derogatory terms.

He also said "this is a men's joint, nothing here but boys and men, and men wanna be girls."

49.     On July 8, 2017, around 9:30 am, Officer Justice was passing out trays of food

when Plaintiff asked him if she could speak with the mental health staff.  Officer Justice opened

the chuck door of her cell, and when she reached for the tray, he smacked her in the face and arm

with it.  Plaintiff screamed for help.  Officer Justice then told everyone on shift that Plaintiff was

on hunger strike, even though she was not.  Plaintiff reported the incident to the mental health

staff, including Stacy Murray.  She was then moved to a different cell, and threatened by I.A.

Frank, Lind, and Bowles that if she keeps reporting them, they would give her a bogus ticket

with a long time in segregation.

50.    On July 19, 2017, Mental Health Counselor Kara Ratajczyk wrote Plaintiff a ticket for allegedly "l[ying] about [a] crisis."  Plaintiff had called for a crisis team and began to speak about the tickets, which she believed were retaliatory.  Ratajczyk asked Plaintiff if she was suicidal, and when she said no, Ratajczyk wrote her a ticket.

51.    From May 24, 2017, to August 8, 2017, Plaintiff filed multiple grievances regarding the sexual and physical abuse she experienced at Pinckneyville, including the March 4 and May 24 incidents.  On August 24, 2017, Plaintiff received a letter from the Administrative Review Board stating that her grievance was going to be investigated by Internal Affairs at Pinckneyville.  Upon information and belief, that investigation never occurred.

### Plaintiff Has Experienced and Continues to Experience Sexual Harassment and Physical Abuse at Menard

52.    On August 23, Plaintiff was transferred to Menard, a high security male prison. Upon information and belief, Plaintiff was transferred to Menard because she had accumulated a number of false disciplinary tickets in retaliation for reporting the abuse she suffered at the hands of the Pinckneyville officers.  A witness reports that officers at Menard knew Plaintiff was coming and were talking about her and plotting ways to harm her once she arrived.

53.    On the bus from Pinckneyville to Menard, Plaintiff was physically assaulted by Defendants Officer Molly and Officers John Does 1-3 without justification.  Officer Molly initiated the attack, taking Plaintiff face down to the bus floor, and Officers John Does 1-3 joined in.  All these officers repeatedly hit, chocked, and kicked Plaintiff.  When she begged them to stop, the officers responded, "Shut up bitch.  This is what happens when you fuck with our staff."  Plaintiff suffered bruises and her face was visibly swollen after the attack.

54.    When she arrived at Menard, she told mental health staff that she was beaten by

the officers on the bus, and the mental health staff told her that she "will get used to it."  She also asked correctional staff to file a PREA complaint, but the officers denied her request and told her to "shut the fuck up."  She was immediately placed in segregation and has remained in segregation since.

55.     Plaintiff was placed in a segregation cell with no running water.  The cell was filthy with urine and feces smeared all over the walls.  She was never provided a real mattress, just a moldy, dirty thin foam pad.  She was denied cleaning supplies for about a month and was forced to live and sleep in the filth.

56.     Since arriving at Menard, the Defendant Officers have constantly harassed and abused her due to her gender identity.  The Defendant Officers call her derogatory names such as "fag," "faggot," "dick sucker," "bitch," "whore," "he/she," "chick with a dick," and more.  The Defendant Officers further threaten her with physical and sexual violence.  This harassment occurs on a daily basis and subjects Plaintiff to extreme humiliation, fear, and anxiety.  It also communicates to the other prisoners who overhear the harassment and threats that the officers will not protect Plaintiff from abuse at their hands.

57.     The Defendant Officers also have made it clear to Plaintiff that they know she filed a PREA complaint about the sexual abuse she experienced at Pinckneyville and that they are going to punish her at Menard for speaking up against fellow IDOC officers.  The Defendant Officers have made various statements to Plaintiff such as "we got a call from our buddies at Pinckneyville," "we know who you are," "we got something up our sleeve for you," "we will bury you in seg," "we will make sure you get raped," "we will make sure you do not make your out date," referencing the day she is supposed to be released from IDOC custody.

58.     On August 26, Plaintiff asked both Defendants Officer McCaleb and Officer

Griffin for her property, which she still had not received since arriving at Menard, and her ID, and these officers responded by telling her to "shut up whore" and calling her other derogatory names.

59.     Later that day, officers flooded her cell to torment her.  When she asked for the officers to help her and for writing materials so that she could write a grievance, officers told her "fuck you" and said they would not help her.  After Plaintiff asked repeatedly to speak to the lieutenant or a crisis team, Defendants Lieutenant Held, Sergeant Jones, Officer McCaleb, and Officer Griffin came to her cell and started calling her derogatory slurs like "dick sucker," "whore," "faggot," and asked her "do you have a dick?"

60.     Defendants Sergeant Jones, Officer McCaleb, and Officer Griffin then proceeded to physically assault Plaintiff without justification while Lieutenant Held watched.  Sergeant Jones repeatedly hit Plaintiff in the face while Officers McCaleb and Griffin chocked, kicked, and punched her.

61.     That same day Defendant Officer McCaleb wrote Plaintiff a disciplinary ticket for allegedly making threats and covering up her cell window.  In fact, Plaintiff did not threaten any officers and only hung up her sheets and blanket to dry them because they were all wet due to the flooding in her cell.  Officer McCaleb wrote Plaintiff this ticket to retaliate against her and cover up the physical assault.  The officers also took away Plaintiff's sheets and blank and did not give her new ones for approximately a month; the new sheets she received were unwashed, filthy, and smelled.

62.     On August 29, 2017, Plaintiff had the hearing on her disciplinary ticket in front of the Adjustment Committee.  She asked if she could provide a written statement and the Adjustment Committee refused to take her written statement or hear anything she had to say.

Defendant Officer Kent Brookman, Chair Person of the Adjustment Committee, told Plaintiff "I know who you are" and that "Pinckneyville told me to put you on my target list." He told Plaintiff that "he runs this motherfucking joint," and she is "in his neck of the woods," and that no one, not even the courts, can help her.

63.     To cover up their retaliatory actions, the officers also gave prisoner Robert Temple, a transgender individual who witnessed Plaintiff's interactions with the officers, a disciplinary ticket on August 26 and told Temple that if she testified against Plaintiff, then they would drop her ticket. On the Adjustment Committee's final summary report on Plaintiff's ticket, they noted that Temple gave a statement corroborating the officer's allegations and found Plaintiff guilty—Plaintiff received an additional three months segregation time.

64.     Plaintiff had written down all her grievances related to the sexual harassment and physical abuse on a piece of paper, and after the Adjustment Committee hearing she was able to put the paper in the counselor's box. However, on September 6, 2017, her grievance was returned to her for not being on the proper grievance form.

65.     Plaintiff was not able to write her grievances on a proper grievance form because the officers at Menard refused to provide her with the form, despite her repeated requests.

66.     Also after the Adjustment Committee hearing, Plaintiff went to see the Mental Health staff and attempted to make a PREA complaint. Defendant Internal Affairs Officer Bridges arrived and told Plaintiff that he refused to help her.

67.     Defendants IA Bridges, Officer Chitty, and other officers then took her to the Internal Affairs office where Officer Chitty sprayed Plaintiff with OC spray all over her face. The officers then locked Plaintiff in the room while she was choking on the OC spray—they all stood outside laughing and stating "PREA this bitch." The officers then dragged Plaintiff back

16

to her cell, refusing to wash off the OC spray.

68.     Plaintiff received a letter from Defendant Warden Lashbrook on September 15, 2017, stating that her allegations made on August 29, 2017 related to PREA were found to be unsubstantiated due to no physical evidence, no video evidence, and no witnesses to support her allegations.  Upon information and belief, no investigation into Plaintiff's allegations of sexual harassment and abuse was ever undertaken.

69.     On October 7, 2017, Plaintiff was taken to see the psychiatrist at Menard.  After her appointment with the psychiatrist, Defendants Officer Miles and Sergeant Jones placed Plaintiff in a holding cell in the infirmary with a prisoner with a high aggression level named John Wilson.  Wilson (whose hands were cuffed in the front, contrary to standard policy) proceeded to beat Plaintiff (whose hands were cuffed in the back) while Defendants Sergeant Jones and Officer Miles and other correctional officers stood by and watched—these officers facilitated and encouraged Wilson to attack Plaintiff.  Wilson grabbed Plaintiff's hair and bashed her head against the wall, punched her in the stomach until Plaintiff fell to the floor, and then repeatedly kicked her while she was down.

70.     Prisoner Dayaion Graves, who was also in the cell, stepped in to save Plaintiff from Wilson.  Defendants Sergeant Jones and Officer Miles then proceeded to spray Plaintiff and Graves with OC spray.  Plaintiff was then dragged out of the cell by these Defendant Officers.

71.     Plaintiff, Graves, and Wilson all received disciplinary tickets that day for fighting—Plaintiff's disciplinary ticket falsely stated that Wilson and Graves were fighting first and then Plaintiff joined in.  Defendant Officer Miles wrote Plaintiff a false disciplinary ticket to cover up the beating he and Sergeant Jones facilitated and encouraged.

72.     October 9, 2017, Plaintiff asked officers for medical attention after being bitten by

an insect in her cell and was refused.  Defendant Officer Cockrum called her a "fag" and "a dick

eating nigger" and refused to call a nurse.  Defendants Sergeant Jones, Officer Cockrum, Officer

Dudzinski, Officer Chitty, Officer Domstorff, Officer Miles, Officer Graves, Officer Caron,

Officer Powell, and Officer John Doe 4 entered her cell and sexually assaulted her—they

touched her breasts and her backside, put a finger in her anus, and tickled her feet.

73.     These Defendant Officers then dragged her out of her cell by her legs and arms

and brought her upstairs, allowing her face to hit the steps.  These Defendant Officers then

proceeded to beat her while Defendant Lieutenant Held and medical staff watched.  They beat

Plaintiff so badly that her entire face and arm was swollen for days and she had a knot by her

eye.  Witnesses report seeing the Defendant Officers drag Plaintiff back to her cell as she was

crying and with a swollen face and messed up hair.

74.     After the beating, Plaintiff received no medical treatment, nor was she allowed to

file a PREA complaint.  Instead, to cover up this beating, Defendants Internal Affairs Officer

Huey and Officer John Doe 4 forced Plaintiff to sign a medical refusal reform by threatening her

with more beatings.  Defendant I.A. Huey also refused to take any pictures of Plaintiff's injuries.

75.     Additionally, to cover up the beating, the Defendant Officers issued Plaintiff a

disciplinary ticket for intimidation, threats, and insolence.  Defendant Sergeant Jones falsely

wrote on Plaintiff's disciplinary ticket that she told the officers "I will spit on all you bitches."

Plaintiff did not say she would spit on the officers or threaten them in any way.

76.     Plaintiff has attempted to submit grievances related to the incidents on October 7

and October 9 but the officers refuse to give her grievances forms.

77.     The Defendant Officers continue to sexually harass and physically abuse Plaintiff.

In addition to the sexual and physical abuse, the officers also harass Plaintiff in other ways such

as refusing to give her food, putting bugs in her food when they do give her a food tray, and throwing away her mail.

78.     The Defendant Officers also constantly use male pronouns instead of female pronouns when referring to and talking to Plaintiff.  The Defendant Officers' pervasive and continual misgendering of Plaintiff is harmful to Plaintiff's mental health.

79.     Plaintiff is in segregation and will remain in segregation until approximately May 2018 due to all the false disciplinary tickets officers have given her in retaliation for her reporting or attempting to report their abuse.  Plaintiff's placement in segregation has prevented her from going to a transgender support group at Menard, which is psychosocial support that she requires.  Plaintiff's placement in segregation has also prevented her from accessing the educational and religious opportunities available at Menard, both of which she desires to participate in.

80.     Since late October 2017, the verbal sexual harassment escalated to sexual assault. Practically every day, officers on the 3pm-11pm shift, Defendant Officers John Does 5-11, come to Plaintiff's cell at various times in the evening and force Plaintiff to move her body in sexually suggestive ways for their entertainment.  The Defendant Officers also force Plaintiff to touch herself sexually and stick her finger in her anus while they stand outside her cell door and watch. They force Plaintiff to show them her private parts and make comments such as "show me what you got," "let me see what you're working with," "let me see you play with yourself," "you got a big ass," "let me see you shake it," "stick something in there," "put your fingers in, go deeper," "you have nice titties," and "you have nice areaolas."  The Defendant Officers also repeatedly assert the sexual acts they would like to perform with and to her.

81.     When Plaintiff pretends like she is asleep so that she does not have to perform for

the officers, the Defendant Officers bang on her cell window and door and order her to perform. The Defendant Officers conveyed to Plaintiff that if she does not obey their orders and perform for them, they will physically hurt her.

82.     Plaintiff fears for her life at Menard.  She has already faced serious physical and emotional injury since being at Menard and will continue to face a grave risk of serious injury if she remains there.

## COUNT I – VIOLATION OF THE EQUAL PROTECTION CLAUSE
### (Fourteenth Amendment Claim for Declaratory and Injunctive Relief under 42 U.S.C § 1983)

83.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

84.     Count I is alleged against Defendant John Baldwin in his official capacity.

85.     Despite being a transgender woman, Plaintiff was immediately placed in a men's prison when she entered IDOC custody without any type of formal review on whether placement in a female prison would be appropriate.

86.     By refusing to place Plaintiff in a woman's prison, IDOC is discriminating against Plaintiff on the basis of her gender identify in violation of the Equal Protection Clause of the Fourteenth Amendment.

87.     Plaintiff seeks injunctive and declaratory relief against Defendant John Baldwin in his official capacity to prevent the continued violation of her constitutional rights.

## COUNT II – VIOLATION OF THE EQUAL PROTECTION CLAUSE
### (Fourteenth Amendment Claim for Damages and Declaratory and Injunctive Relief under 42 U.S.C § 1983)

88.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

89.     Count II is alleged against all the individual Defendants as well as Defendants Director Baldwin and Warden Lashbrook in their official capacities.

90.     Since arriving at Menard, the individual Defendants have continually subjected Plaintiff to verbal sexual harassment due to her gender identity.  The verbal harassment is so pervasive and ongoing that it constitutes intentional discrimination on the basis of her gender identity.  Plaintiff is subjected to constant insults, threats, intimidation, and humiliation that male prisoners do not endure.

91.     As a result of the unjustified and unconstitutional conduct of the individual Defendants, Plaintiff suffered and continues to suffer damages, including but not limited to, actual damages, humiliation, pain, fear, and emotional distress.

92.     Additionally, Plaintiff seeks injunctive and declaratory relief against Defendants Director Baldwin and Warden Lashbrook in their official capacities to prevent the continued violation of her constitutional rights.

## COUNT III – EXCESSIVE FORCE
### (Eighth Amendment Claim for Damages and Declaratory and Injunctive Relief under 42 U.S.C. § 1983)

93.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

94.     Count III is against Defendants Officer Molly, Sergeant T. Jones, Officer John McCaleb, Officer Griffin, Officer Chitty, Officer Dudzinski, Officer Cockrum, Officer Domstorff, Officer Miles, Officer Graves, Officer Caron, Officer Powell, and Officer John Does 1-4, as well as Defendants Director Baldwin and Warden Lashbrook in their official capacities.

95.     The actions of the individual Officer Defendants described above related to the incidents on August 23, 2017, August 26, 2017, October 7, 2017, and October 9, 2017,

constituted unreasonable and excessive force, without legal cause, in violation of Plaintiff's Eighth Amendment rights.

96.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights, and not for any legitimate penological purpose.

97.     The actions of the individual Officer Defendants were the direct and proximate cause of the violations of Plaintiff's constitutional rights and of the damages suffered by Plaintiff, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

98.     Additionally, Plaintiff seeks injunctive and declaratory relief against Defendants Director Baldwin and Warden Lashbrook in their official capacities to prevent the continued violation of her constitutional rights.

## COUNT IV – FAILURE TO INTERVENE
### (Eighth Amendment Claim for Damages under 42 U.S.C. § 1983)

99.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

100.     Count IV is alleged against Defendants Officer Molly, Sergeant T. Jones, Officer John McCaleb, Officer Griffin, Officer Chitty, Officer Dudzinski, Officer Cockrum, Officer Domstorff, Officer Miles, Officer Graves, Officer Caron, Officer Powell, Lieutenant Held, Internal Affairs Officer Bridges, and Officer John Does 1-4.

101.     During the excessive force events described above, the individual Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity and duty to do so.

102.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established

constitutional rights, and not for any legitimate penological purpose.

103.    As a direct and proximate result of the Defendants' failure to intervene, Plaintiff

suffered damages, including bodily injury, pain, suffering, emotional distress, anguish, and

humiliation.

### COUNT V – FAILURE TO PROTECT
#### (Eighth Amendment Claim for Damages and Declaratory and Injunctive Relief under 42 U.S.C. § 1983)

104.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this

Count.

105.    Count V is alleged against Defendants Sergeant Jones and Officer Miles, as well

as Defendants Director Baldwin and Warden Lashbrook in their official capacities.

106.    By intentionally placing Plaintiff in a holding cell with Wilson, with Wilson's

hands cuffed in front and hers cuffed in back, Defendants Sergeant Jones and Officer Miles knew

of and disregarded the substantial risk that Plaintiff would be harmed by Wilson, in violation of

Plaintiff's Eighth Amendment rights.

107.    The Officer Defendants have made it clear to Plaintiff that they will not protect

her from other prisoners who wish to harm her due to her gender identity.

108.    The Officer Defendants' above-described actions and omissions were undertaken

with malice and/or reckless disregard for Plaintiff's clearly established constitutional rights.

109.    As a direct and proximate result of the Officer Defendants' unconstitutional

conduct, Plaintiff suffered damages, including bodily injury, pain, suffering, emotional distress,

anguish, and humiliation.

110.    Additionally, Plaintiff seeks injunctive and declaratory relief against Defendants

Director Baldwin and Warden Lashbrook in their official capacities to prevent the continued

violation of her constitutional rights.

## COUNT VI – CRUEL AND UNUSUAL PUNISHMENT
### (Eighth Amendment Claim for Damages and Declaratory and Injunctive Relief under 42 U.S.C. § 1983)

111.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

112.    County VI is alleged against Defendant Officers John Does 5-11 as well as Defendants Director Baldwin and Warden Lashbrook in their official capacities.

113.    By subjecting Plaintiff to constant sexual harassment and sexual abuse, including forcing Plaintiff to perform sexually for their entertainment, the Defendant Officers John Does 5-11 inflicted unnecessary and wanton pain on Plaintiff without any legitimate penological purpose, in violation of Plaintiff's Eight Amendment rights.

114.    The Officer Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Plaintiff's clearly established constitutional rights.

115.    As a direct and proximate result of the Officer Defendants' unconstitutional conduct, Plaintiff suffered damages, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

116.    Additionally, Plaintiff seeks injunctive and declaratory relief against Defendants Director Baldwin and Warden Lashbrook in their official capacities to prevent the continued violation of her constitutional rights.

## COUNT VII – RETALIATION
### (First Amendment Claim for Damages and Declaratory and Injunctive Relief under 42 U.S.C. § 1983)

117.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

118.    Count VII is alleged against all the individual Defendants as well as Defendants Director Baldwin and Warden Lashbrook in their official capacities.

119.    As described in detail above, all the individual Defendants have retaliated against Plaintiff for exercising her constitutional right to report the sexual and physical abuse she has experienced and continues to experience, in violation of the First Amendment.

120.    The individual Defendants' above-described actions were undertaken with malice and/or reckless disregard for Plaintiff's clearly established constitutional rights.

121.    As a direct and proximate result of the individual Defendants' unconstitutional conduct, Plaintiff suffered damages, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

122.    Additionally, Plaintiff seeks injunctive and declaratory relief against Defendants Director Baldwin and Warden Lashbrook in their official capacities to prevent the continued violation of her constitutional rights.

### COUNT VIII – CONSPIRACY TO DEPRIVE CONSITUTIONAL RIGHTS
### (Conspiracy Claim for Damages under 42 U.S.C. § 1983)

123.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

124.    Count VIII is alleged against all the individual Defendants.

125.    Each of the Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

126.    Each of the Defendants took concrete steps to enter into an agreement to retaliate against Plaintiff for reporting the abuse she experienced at Pinckneyville and the abuse she continues to experience at Menard and thereby deprive Plaintiff of her First Amendment rights.

127.    Additionally, as part of the conspiracy to retaliate against Plaintiff, certain individual Defendants, as specified above, entered into an agreement to unlawfully use force on Plaintiff and to allow Wilson to attack Plaintiff, for the purpose of violating Plaintiff's Eighth Amendment rights.

128.    In furtherance of this conspiracy, each of the Defendants committed specific overt acts, as described above in the Complaint, and was an otherwise willful participant in joint activity.

129.    Each individual Defendant is liable for the violation of Plaintiff's rights by any other individual Defendant.

130.    Each individual Defendant acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's clearly established constitutional rights.

131.    As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

### COUNT IX – UNLAWFUL POLICY AND PRATICE
#### (*Monell* Claim for Declaratory and Injunctive Relief under 42 U.S.C. § 1983)

132.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

133.    Count IX is alleged against Defendants Director Baldwin and Warden Lashbrook in their official capacities.

134.    The actions of the individual Defendants were undertaken pursuant to policies, practices, and customs of the Illinois Department of Corrections, described above and below, which were ratified by policymakers for the Illinois Department of Corrections with final policymaking authority.

135.    At all times material to this complaint, the Illinois Department of Corrections has

interrelated *de facto* policies, practices, and customs related to transgender prisoners which included, inter alia:

(a) improperly housing transgender women prisoners in male prisons instead of the female prisons;

(b) failing to properly train IDOC employees on how to care for and interact with transgender prisoners;

(c) allowing a culture of harassment and abuse of transgender prisoners to exist at IDOC prisons;

(d) failing to adequately investigate complaints by transgender prisoners related to allegations concerning PREA and other wrongdoing on the part of correctional officers.

136. According to the 2016 PREA reports of IDOC facilities, there were no transgender prisoners in the two female prisons (Logan Correctional Center and Decatur Correctional Center), and 28 transgender women housed throughout the 24 male prisons. According to the report three transgender women were housed in Menard.  4.4% of the total number of people interviewed by the PREA auditors were transgender.

137. Upon information and belief, there is currently one transgender prisoner in Logan, however, as the PREA reports demonstrate, this is an anomaly—almost all the transgender prisoners are housed in male prisons where they are at risk of being subjected to sexual and physical abuse.

138. The interrelated policies, practices, and customs alleged above were well known within the Illinois Department of Corrections.  During the relevant time period, Defendants Director Baldwin and Warden Lashbrook had notice of these widespread practices by employees

at the IDOC, and in particular at Menard.

139.    The widespread practices were allowed to flourish—and become so well settled as to constitute de facto policy of the IDOC—because governmental policymakers and authority over the same, namely, Defendants Baldwin and Lashbrook, exhibited deliberate indifference to the problem, thereby effectively ratifying it.

140.    The interrelated policies, practices, and customs alleged above were the direct and proximate cause of the unconstitutional acts committed by the individual Defendants and the injuries suffered by Plaintiff.

141.    Plaintiff seeks injunctive and declaratory relief against Defendants Baldwin and Lashbrook in their official capacities to prevent the continued violation of her constitutional rights and the rights of other transgender women in IDOC custody.

## COUNT X – VIOLATION OF TITLE IX
### (Claim for Declaratory and Injunctive Relief under Title IX, 20 U.S.C. § 1681(a))

142.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

143.     Count X is alleged against Defendants Director Baldwin and Warden Lashbrook in their official capacities.

144.    Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

145.    Menard receives federal funding and offers both Adult Basic Education and GED programs.

146.    The Defendants are depriving Plaintiff of the ability to participate in the educational opportunities offered at Menard by intentionally discriminating against her on the

basis of her gender identity and subjecting her to segregation in retaliation for reporting their abuse.

147.    Plaintiff seeks injunctive and declaratory relief against Defendants Director Baldwin and Warden Lashbrook in their official capacities to prevent the continued violation of her rights under Title IX.

## COUNT XI – RELIGIOUS LAND USE AND INSTITIONALIZED PERSONS ACT
### (Claim for Declaratory and Injunctive Relief under RLUIPA, 42 U.S.C. § 2000cc et seq.)

148.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

149.    County XI is alleged against Defendants Director Baldwin and Warden Lashbrook in their official capacities.

150.    Defendants substantially burdened Plaintiff's exercise of her religion by depriving her of the ability to participate in the religious activities offered at Menard by intentionally discriminating against her on the basis of her gender identity and subjecting her to segregation in retaliation for reporting their abuse.  Plaintiff's placement in segregation was not the least restrictive means of advancing any compelling government interest.

151.    Plaintiff seeks injunctive and declaratory relief against Defendants Director Baldwin and Warden Lashbrook in their official capacities to prevent the continued violation of her rights under RLUIPA.

## COUNT XII – ILLINOIS HATE CRIMES ACT
### (State law claim for Damages and Injunctive Relief)

152.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

153.    Count XII is alleged against all the individual Defendants as well as Defendants

Director Baldwin and Warden Lashbrook in their official capacities.

154.    The Illinois Hate Crimes Act states, in relevant part, that "[i]ndependent of any criminal prosecution" victims of hate crimes "may bring a civil action for damages, injunction or other appropriate relief."  720 ILCS 5/12-7.1(c).

155.    A person commits a hate crime when "by reason of the actual or perceived . . . gender [or] sexual orientation . . . regardless of the existence of any other motivating factor or factors," he or she commits various offenses, including, inter alia, assault, battery, mob action, and disorderly conduct.  720 ILCS 5/12-7.1(a).

156.    The individual Defendants committed hate crimes against Plaintiff by physically and sexually assaulting her and by intimidating and harassing her using obscene language due to her gender and sexual orientation.

157.    As a result of the Defendants' actions, Plaintiff suffered damages, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

158.    Additionally, Plaintiff seeks injunctive and declaratory relief against Defendants Director Baldwin and Warden Lashbrook in their official capacities to prevent the continued violation of her rights under the Illinois Hate Crimes Act.

## COUNT XIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (State law claim for Damages)

159.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

160.    Count XIII is alleged against all the individual Defendants.

161.    The individual Defendants' conduct described above was extreme and outrageous. The Defendants' actions were rooted in an abuse of power and authority, and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would

cause, severe emotional distress to Plaintiff.

162.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

## COUNT XIV –CIVIL CONSPIRACY
### (State Law Claim for Damages)

163.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

164.    Count XIV is alleged against all the individual Defendants.

165.    As described more fully above, the Defendants, acting in concert with other as-yet unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

166.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the intentional infliction of emotional distress upon Plaintiff.

167.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and/or reckless disregard to Plaintiff's rights.

168.    As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered injuries, including severe emotional distress and anguish.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Deon "Strawberry" Hampton requests that this Court enter judgment in her favor against the Defendants in the following manner:

1.    Adjudge and declare that the policies, practices, and conduct described in this Complaint are in violation of the rights of Plaintiff under the First, Eighth, and Fourteenth

Amendments to the United States Constitution, as well as her rights under Title IX, the Religious

Land Use and Institutionalized Persons Act, and the Illinois Hate Crimes Act.

     2.     Enjoin the Defendants from subjecting Plaintiff to the unlawful policies, practices,

and conduct described in this Complaint.

     3.     Order that Plaintiff be transferred out of Menard Correctional Center to Logan

Correctional Center, the female prison, and placed in general population.

     4.     Order further injunctive relief necessary to address the ongoing violations

suffered by Plaintiff.

     5.     Retain jurisdiction of this case until such time as the Defendants have fully

complied with all orders of the Court, and there is reasonable assurance that the Defendants will

continue to comply in the future with these orders.

     6.     Award Plaintiff compensatory and punitive damages.

     7.     Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 42

U.S.C. § 1988.

     8.     Award Plaintiff such other and further relief as this Court may deem appropriate

and just.

<strong>JURY DEMAND</strong>

     Plaintiff demands trial by jury.


Dated: December 14, 2017

                                  Respectfully submitted,

                                  **DEON "STRAWBERRY" HAMPTON**

                                  By: <u>/s/ Vanessa del Valle</u>
                                      One of her attorneys

Sheila A. Bedi
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271
sheila.bedi@law.northwestern.edu
vanessa.delvalle@law.northwestern.edu

Alan Mills
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640
(773) 769-1411
alan@uplcchicago.org

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that she served the foregoing document upon all persons who have filed appearances in this case via the Court's CM/ECF system on December 14, 2017.

/s/ Vanessa del Valle